DECISION AND JUDGMENT ENTRY
This is an appeal from: 1) a June 15, 1999 decision and judgment entry of the Lucas County Court of Common Pleas in which the court ruled that appellant was not entitled to a hearing on most of the claims he raised in a petition for postconviction relief; and 2) a November 30, 1999 judgment entry of the Lucas County Court of Common Pleas in which the court ruled that appellant failed to show, after an evidentiary hearing held on the one remaining claim from his petition for postconviction relief, that he was "in any way prejudiced by trial counsel's failure to retain an eyewitness identification expert." The trial court therefore denied all of the claims raised in appellant's petition for postconviction relief.
Appellant has presented three assignments of error for consideration on appeal that are:
"ASSIGNMENT OF ERROR NO. I
 THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S POST-CONVICTION PETITION WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS TO MERIT AN EVIDENTIARY HEARING AND DISCOVERY.
"ASSIGNMENT OF ERROR NO. II
 OHIO POST-CONVICTION PROCEDURES DO NOT AFFORD AN ADEQUATE CORRECTIVE PROCESS NOR DO THEY COMPLY WITH DUE PROCESS OR EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT.
"ASSIGNMENT OF ERROR NO. III
 THE TRIAL COURT ERRED IN DISMISSING APPELLANT MADRIGAL'S FIFTH GROUND FOR RELIEF, WHERE HE PRESENTED EVIDENCE TO SUBSTANTIATE HIS CLAIM DURING AN EVIDENTIARY HEARING."
Before we address the arguments presented relating to the assignments of error, we will briefly review the facts and procedure in this case.
On May 13, 1996, the grand jury sitting in Lucas County, Ohio, filed an indictment in the Lucas County Court of Common Pleas charging appellant with aggravated murder, a violation of R.C. 2903.01(B) and with aggravated robbery, a violation of R.C. 2911.01(A)(1). In addition to the principal charges, the indictment contained two specifications for use of a firearm in commission of the crimes, and a death penalty specification that appellant was the principal offender who committed murder in the course of an aggravated robbery.
The case proceeded to trial. Several witnesses identified appellant as the individual who entered a Kentucky Fried Chicken restaurant in Toledo, Ohio on Friday, April 12, 1996, locked the doors behind him, vaulted over the service counter, pulled a gun and forced an employee to put all the cash from the cash registers into a bag, and then shot and killed an eighteen year old female manager execution style while she was kneeling on the floor crying and trying to comply with his demand that she open a safe in a back office. After hearing all the evidence, the jury returned verdicts finding appellant guilty of both principle charges and the accompanying specifications.
After a mitigation hearing was held, the jury returned a recommendation that the trial court sentence appellant to death. On November 25, 1996, the trial court followed the recommendation of the jury, and imposed the death penalty on appellant.
On December 6, 1996, the trial court granted a motion filed by appellant for appointed counsel to represent him for postconviction relief. On January 15, 1997, appellant, through separate appellate counsel, filed a notice of direct appeal to the Supreme Court of Ohio. Appellant then filed a motion for postconviction relief in the trial court on September 21, 1998. Appellant presented twenty-three claims for relief in his petition for postconviction relief. He subsequently filed amendments to his petition for postconviction relief to add an additional claim and to add exhibits.
On January 15, 1999, the trial court ruled that appellant was not entitled to an evidentiary hearing on most of his claims for relief. The trial court did find that appellant was entitled to an evidentiary hearing on one claim; that he received ineffective assistance of counsel when his trial attorneys failed to call an expert on eyewitness identification.
Appellant filed a notice of appeal from that ruling in this court. We ruled that we had no jurisdiction to consider the appeal because the trial court's ruling was not final and appealable. State v. Madrigal
(July 30, 1999), Lucas App. No. L-00-1006, unreported. The trial court subsequently held the evidentiary hearing regarding whether appellant received ineffective assistance of counsel when no expert on eyewitness identification was called at trial.
After hearing all the testimony presented by appellant, the trial court ruled that appellant failed to show that his attorneys fell below an objective level of reasonable representation when they did not ask for funds to hire an expert on eyewitness identification. The court said that a defense attorney who testified on behalf of appellant acknowledged that it was his personal opinion that an expert witness on eyewitness identification should have been called, and that Ohio law does not dictate that an eyewitness expert should be hired in every capital case.
The court noted that appellant did not call either of his trial counsel to the stand to explain their reasons for not calling an expert on eyewitness identification. The court said that it must therefore follow a presumption that they had good reasons for choosing not to call a witness.
The court said that none of the eyewitnesses who testified at trial suffered from any physical or mental impairment that would justify the need for an expert to comment upon the credibility of the witness's testimony. Finally, the trial court noted that appellant's trial counsel did cross-examine the eyewitnesses regarding discrepancies in their identifications of appellant, filed motions seeking to prohibit the introduction of eyewitness testimony, raised appropriate objections at trial, and argued that the eyewitness testimony was not reliable in closing argument.
The trial court said since appellant's trial counsel did effectively address the question of whether the eyewitness testimony was reliable, appellant was not prejudiced by the failure to call an expert on eyewitness identifications, and he did not receive ineffective assistance of counsel. The trial court therefore found that all of appellant's claims for postconviction relief were not well-taken. Appellant then filed this appeal.
In support of his first assignment of error, appellant argues that the trial court erred when it ruled that he was not entitled to an evidentiary hearing on most of his claims for relief. He makes three general arguments at the outset. First, he says that each of his claims related to violations of his constitutional rights. Second, he says he gave sufficient facts to support an evidentiary hearing on each of his claims, and that he was entitled to conduct further discovery related to his claims. He argues that he was not required to actually prove prejudice in his petition, rather he must meet that burden of proof at an evidentiary hearing. Finally, he argues that res judicata did not apply to his claims that were supported by evidence outside the record. He then discusses individual claims that he argues merited an evidentiary hearing.
First, he says he was entitled to an evidentiary hearing on his claim that he received ineffective assistance of counsel when his lead attorney chose not to follow the advice of his second chair attorney. Specifically, the second chair attorney urged that a motion to suppress be filed to exclude from evidence a gun and some clothing that were seized by the officers who placed appellant under arrest after he was found sleeping on a couch in an apartment in Cleveland.
Appellant points to evidence he filed in support of his petition to show that the disagreement did exist among his trial counsel regarding whether the motion to suppress should be pursued. He argues that the trial court's conclusion that an exception to the requirement of a warrant applied in this case, so the motion to suppress would have been denied is irrelevant and only confuses the issue. He says: "At the very least, defense should have filed the motion to suppress in order to preserve this viable claim for appeal."
He also argues that his trial counsel violated an ethical consideration by not informing him of their dispute and allowing him to choose which course to pursue. He rejects the rulings of the trial court that his attorneys were only guided by (rather than bound by) the ethical consideration, and that there is no evidence to show that the outcome of the trial would be different if the motion to suppress were pursued.
We begin by noting that the Supreme Court of Ohio has held:
 "In a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." State v. Jackson (1980), 64 Ohio St.2d 107, syllabus.
Therefore, appellant's assertions that he did not need to present evidence of prejudice until a hearing was held are not persuasive.
We also note that a change in the timing of postconviction procedures can make it more difficult for a trial court to apply the rules that:
 "Constitutional issues cannot be considered in postconviction proceedings under Section 2953.21 et seq., Revised Code, where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him.
"* * *
 "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." State v. Perry (1967), 10 Ohio St.2d 175, 176 at paragraphs seven and nine of the syllabus.(Emphasis sic).
Under the statutory procedures in effect when State v. Perry was decided, it was common for a defendant to complete a direct appeal before he filed a petition for postconviction relief. Under the current statutory procedures, however, new deadlines have been set Cfor filing a petition for postconviction relief, resulting in the necessity of a defendant pursuing a petition for postconviction relief at the same time that the defendant is pursuing a direct appeal. See R.C. 2953.21.
In this case, the direct appeal to the Supreme Court was being considered at the same time that the trial court was considering appellant's petition for postconviction relief. The trial court therefore did not have the benefit of knowing the issues raised on direct appeal or the resolution of those issues. Since the trial court released its decision on the petition for postconviction relief, the decision of the Supreme Court of Ohio on appellant's direct appeal has been released and has been made a matter of public record. State v. Madrigal (2000),87 Ohio St.3d 378.
The opinion from the Supreme Court of Ohio shows that the issue of ineffective assistance of counsel for not seeking a suppression order of the gun and clothing argued in appellant's petition for postconviction relief was indeed pursued on appeal:
 "In his first proposition of law, Madrigal argues his trial counsel were ineffective because they failed to attempt to suppress evidence seized when he was arrested at the Cleveland apartment." Id. at 388.
The Supreme Court said that the failure to file a motion to suppress is not per se ineffective assistance of counsel and noted that in this case it actually worked to appellant's benefit not to exclude the evidence, since the gun "was never conclusively tied to the murder in this case."Id. at 389. The Supreme Court further said that even if it assumedarguendo that appellant's trial counsel should have filed the motion to suppress, it could still not find that appellant met the second part of the test for ineffective assistance of counsel. The Supreme Court said appellant's case was not prejudiced because even without the gun and clothing found in Cleveland, there would still have been compelling evidence against appellant. Id.
In this instance, it is clear that the evidence dehors the record would not change the analysis followed by the Supreme Court of Ohio on direct appeal. Therefore, we find that the trial court did not err when it concluded there was no substantial evidence to merit an evidentiary hearing on appellant's claim that he received ineffective assistance of counsel when his trial attorneys chose not to pursue a motion to suppress the gun and clothing seized in Cleveland at the time of his arrest and when they did not present their dispute on the issue to him.
Appellant also argues that the trial court erred when it ruled he was not entitled to an evidentiary hearing on his claims of ineffective assistance of counsel relating to the mitigation hearing portion of his trial. Appellant presents several arguments, that can be grouped into three main categories, that he says show that he received ineffective assistance of counsel in regard to the mitigation hearing.
First, he says his attorneys did not seek a continuance to conduct a reasonable mitigation investigation, including an investigation of his history of alcohol abuse, severe childhood abuse and racial identity problems and how they impacted his development. Second, he argues that his attorneys failed to call several family members during the mitigation hearing in his case, resulting in a failure to have the jury consider all of the mitigating evidence that could have been offered on his behalf. Third, he says his trial attorneys should have called a cultural expert during the mitigation hearing to explain the problems he experienced due to his biracial identity.
Appellant says that he presented sufficient evidence outside of the record to show that relevant information about his background was not discovered or presented at trial. He argues that the jury was given such an incomplete picture of his childhood, it could not reasonably decide if the mitigating evidence outweighed the aggravating circumstances of the crime.
He says his trial counsel fell below an objective standard of reasonable representation because they did not completely investigate his background and did not adequately prepare the witnesses they did call on his behalf during the mitigation hearing. He says his case was prejudiced, since his trial attorneys had the chance to do the most good for him during the mitigation phase of his trial.
He has provided the affidavits of several of his maternal relatives who aver that they had reason to believe that he was abused and neglected as a child, and that they would have testified about their knowledge if they had been called as witnesses, but they were not contacted by appellant's trial attorneys. He also submitted the affidavit of his mitigation expert who avers that she was not available at the time of trial because she had just given birth to a child and that she believes appellant would "probably" have benefited from her presence at trial. Finally, he submitted the affidavit of an experienced mitigation expert who averred that the investigation of appellant's background was inadequate and that the mitigation expert should have been present at trial to assist trial counsel and to prepare mitigation witnesses.
The trial court ruled that the additional information offered by appellant's relatives through affidavits was merely cumulative to the testimony that the jury heard during the mitigation portion of appellant's trial. The court also said that the additional information about appellant's dismal upbringing was of questionable mitigating value. The trial court concluded that there was no substantial evidence to show either that the representation provided by appellant's trial counsel fell below an objective standard of reasonable representation or that appellant was prejudiced by the representation. The trial court therefore dismissed the claim without granting appellant an evidentiary hearing on the issue.
Our own careful review of the record and of the affidavits presented by appellant in support of his petition for postconviction relief has led us to the same conclusions reached by the trial court. While the trial transcript does show that appellant's stepparents were not as forthcoming as they might have been concerning the details of the difficulties appellant faced while growing up, the jury was provided with information that showed that appellant's upbringing was less than ideal.
For instance, the jury learned that appellant was born to a single, teen-aged mother. They learned that his mother was of one race, Hispanic, and that his father was of another race, African-American. They learned that appellant had difficulties connected to his biracial identity and that he often felt misplaced. They learned that he was abandoned by his mother when he was seven years old and was left with his stepfather, who was African-American, and with his stepfather's wife, who was White. His mother left him at his stepfather's mother's house in Fremont with all of his belongings in garbage bags. She returned to Toledo and saw him infrequently, often promising to visit and then not appearing. She left him in his stepparents' custody after they asked her to because they saw bruising on appellant's legs and believed he was being beaten by his mother and her boyfriend.
The jury learned that appellant thought his stepfather was his biological father, and that he learned in his teens that someone else was his biological father. His biological father told him he did not want a relationship with appellant because it would interfere with his relationship with a woman.
The jury learned that when he was twelve or thirteen years old, his stepparents were divorced because his stepfather developed an ever increasing drug problem. They heard that his stepmother took him to live with her and her two daughters for a time but had to return him to his stepfather because she did not have enough money to feed and cloth him in addition to her own children.
The jury heard, through another of his stepfather's ex-wives, that after he was returned to his stepfather appellant was often locked outside of his home until the early hours of the morning because his stepfather and his friends were smoking crack cocaine inside the home. This ex-wife said she was nineteen when she moved in with appellant's stepfather, and appellant was thirteen. She said appellant did not have any strong parental discipline or guidance while he lived with them. She said after about a year, appellant returned to live with his biological mother.
When his stepfather testified at trial, he admitted that he had been brought to the court from the Sandusky County Jail where he was incarcerated for crimes relating to drugs. He admitted that he had not been much of a father to appellant for most of appellant's childhood, but then testified that appellant was a "normal teenager" for most of the time he lived with his stepfather.
The jury learned, through testimony of the psychologist, that appellant attended eight different schools, failed the third grade, dropped out of school in the ninth grade and later earned his GED. They also learned that during his teen years, appellant was shifted back and forth between his biological mother in Toledo, and his stepfather in Fremont. Both his mother and his stepfather abused drugs.
The psychologist testified that appellant's childhood existence was "chaotic" and said that all of the chaos caused appellant to develop a personality disorder with antisocial and borderline traits. The psychologist said appellant had difficulty associated with his biracial identity: "that he hardly knew what race he was, and it was important to him." He also concluded, after testing appellant, that appellant has borderline intellectual functioning and that he suffers from alcohol abuse.
The averments presented in appellant's affidavits certainly provide more details regarding the chaos, and even the abuse, appellant experienced during his childhood. The averments also shed more light on some of appellant's problems caused by his biracial identity, including his feelings of rejection by his Hispanic relatives. Finally, the averments show that some of the witnesses who did testify at trial could have been better prepared.
However, like the trial court, we conclude that the evidence outside the record is only cumulative of the evidence that was presented to the jury, and that appellant was not prejudiced by his trial counsel's failure to present the further evidence since it still would not have outweighed the aggravating circumstances of the crime. See, also, Statev. Madrigal (2000), 87 Ohio St.3d 378, 399-401 (Supreme Court's independent review of the record results in ruling that aggravating circumstances outweigh mitigating factors beyond a reasonable doubt). Therefore, appellant's arguments that he received ineffective assistance of counsel relating to the mitigation hearing portion of his trial are not well-taken.
Appellant next argues that he received ineffective assistance of trial counsel because his attorneys did not ask for a change of venue after conducting voir dire. He says every juror had knowledge of his case prior to trial because of their exposure to extensive media coverage.
He argues that the trial court erred when it ruled that res judicata
applied because he could have raised the issue on direct appeal. He says that he could not litigate this issue on direct appeal because his argument relies upon evidence outside the record. He points to the evidence outside the record that he did file. The evidence includes an affidavit from his stepfather who averred that he heard a radio disc jockey from 92.5 FM say "burn the nigger" when commenting on appellant's trial and copies of all the articles that appeared in The Toledo Blade relating to the robbery and murder, the description of the suspect sought by the police and appellant's arrest and indictment. He says that he could not get a fair and impartial jury because of the extensive media coverage and that his trial was prejudiced because his trial attorneys did not seek a change of venue.
The Supreme Court of Ohio has said:
 "It is rare for a court to presume that a jury is prejudiced by pretrial publicity. State v. Lundgren
(1995), 73 Ohio St.3d 474, 479. Moreover, the fact that prospective jurors have been exposed to pretrial publicity does not, in and of itself, demonstrate prejudice. `Pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.' Nebraska Press Assn. v. Stuart (1976), 427 U.S. 539, 554. Therefore, if the `record on voir dire establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and the evidence presented at trial, it is not error to empanel such veniremen.' State v. Maurer (1984), 15 Ohio St.3d 239, 252; State v. Carter (1995), 72 Ohio St.3d 545, 556. In State v. Bayless (1976), 48 Ohio St.2d 73, 98, we stated that `a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" State v. White (1998), 82 Ohio St.3d 16, 21. (Emphasis sic).
The State v. White court went on to note that in that case the trial court had conducted an extensive voir dire and had excused all jurors who indicated that they could not set aside the knowledge they had of the case from media reports. The Supreme Court of Ohio said there was no proof of prejudice to the appellant in that case from pretrial publicity.Id.
While the evidence dehors the record offered by appellant in this case certainly does provide more detail regarding the content of the media coverage of: 1) the crime; 2) the search for a suspect; and 3) appellant's arrest and arraignment than the trial record showed, it does not, as appellant asserts, show that he was prejudiced from having a fair trial. The trial record shows that each potential juror was asked about previous knowledge and impressions of this case that they formed from media reports, both from broadcasts and from reports in print. While some jurors indicated that they did have some memory of reports about a robbery and murder at a Kentucky Fried Chicken restaurant, all of the jurors selected indicated that they could set aside all that they learned through media coverage and could base their verdict solely on the evidence heard at trial. Accordingly, the trial court did not err when it ruled that the evidence dehors the record was not sufficient to warrant an evidentiary hearing on the question of whether appellant received ineffective assistance of counsel when his attorneys did not seek a change of venue due to pretrial publicity.
Appellant's next claim for ineffective assistance of counsel is based upon two arguments. He says his counsel fell below an objective standard of reasonable representation when they failed to object to misleading jury instructions given during the mitigation/sentencing phase of his trial. He says that the instructions erroneously shifted the burden of proof to him during the mitigation/sentencing phase.
He also argues that his trial counsel failed to object to prosecutorial misconduct during the closing statements of the mitigation/sentencing phase of his trial. He alleges that the prosecutor's arguments that he would be dangerous in the future and should be put to death so society would never again be at risk of his violent behavior constituted an argument about an additional aggravating factor that is not included in the statutory list of factors that can be considered as aggravating factors.
He says that the trial court erred when it ruled that res judicata
applied to this claim. He says that the claim could not be fully litigated on direct appeal because it is based on facts not appearing in the record. He then cites to two exhibits he attached in support of his petition for postconviction relief. The first exhibit he refers to is an affidavit in which the affiant provides "an analysis of the language of the Ohio Jury Instructions (OJI) that focuses on two main questions: (a) whether or not the language of the OJI is sufficiently clear in meaning to guide the discretion of jurors in deciding between recommending the death penalty or life in prison and (b) whether the OJI may bias jurors toward one verdict over others." The second exhibit he refers to is a paper prepared by Peter Meijes Tiersma of Loyola Law School titled: "DICTIONARIES AND DEATH: DO CAPITAL JURORS UNDERSTAND MITIGATION?".
Both of the exhibits referred to by appellant as essential proof outside the record present intellectual arguments that could have been argued on direct appeal. Therefore, the exhibits were not substantial evidence that triggered an obligation on the part of the trial court to hold an evidentiary hearing on this claim.
Furthermore, we note that the Supreme Court of Ohio did consider the argument relating to the jury instruction appellant complains of here when it heard appellant's direct appeal of his conviction. State v.Madrigal, 87 Ohio St.3d 378, 395-396. The Supreme Court said:
 "Madrigal is correct that the language used by the trial court to describe the weighing process is not a correct recitation of the law. R.C. 2929.03(D)(1) specifically states that the state has the burden of proving, beyond a reasonable doubt, that the aggravating circumstances sufficiently outweigh the mitigating factors. `Absent such a finding, the jury shall recommend that the offender be sentenced to life * * *.' R.C. 2929.03(D)(2). The instruction given by the trial court is not only technically wrong, but by reversing the language of the statute, it fails to tell the jury what happens if the aggravating circumstances and mitigating factors are in equipoise.
 "Nevertheless, it is well established that `a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' Cupp v. Naughten (1973), 414 U.S. 141, 146-147; State v. Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus. * * *" Id. at 395-396. (Emphasis sic).
The court went on to say that when the jury instructions were considered as a whole, "it cannot be said that `but for the error, the outcome of the trial clearly would have been otherwise.' Id. at 396. The court clearly found that appellant did not suffer any prejudice to his case as a result of the now complained of jury instruction. Therefore, in any event, appellant's claim for ineffective assistance of counsel on that basis fails.
Likewise, appellant's argument that the prosecutor engaged in prejudicial misconduct is unpersuasive. The record shows that appellant presented testimony that he adjusted well to prison life and argued that should be considered a mitigating factor. In closing argument, the prosecutor argued that appellant's adjustment to prison life was entitled to little weight in view of the fact that he would still, at some point, be entitled to be released from prison if he did not receive the death penalty, and argued that he would still be dangerous because of his personality disorder. The Supreme Court of Ohio has said on at least two occasions that prosecutorial remarks regarding the future dangerousness of a criminal are permissible in a rebuttal closing argument. See,e.g., State v. Wiles(1991), 59 Ohio St.3d 71, 89; State v. Beuke (1988),38 Ohio St.3d 29, 33. The future dangerousness of appellant was not presented as an aggravating factor to consider in the jury instructions. The trial court did not err when it ruled that appellant was not entitled to an evidentiary hearing on this claim.
Finally, appellant argues in support of his first assignment of error that the trial court should have granted him an evidentiary hearing on his claim that the death penalty is unconstitutional because it is cruel and unusual. He says, once again, that the trial court erred when it applied res judicata to his claim, because he relied upon evidence outside the record. His evidence outside the record includes accounts of problems that arose in other cases with actually administering the death penalty.
The evidence outside the record relied upon by appellant in the trial court and in this court relates to the whole public policy issue of whether death by electrocution or by lethal injection is considered so cruel and unusual in our society that it must be banned pursuant to the Eighth Amendment's prohibition of cruel and unusual punishment. Considering the repeated rulings of the Supreme Court of Ohio that death administered by the state to convicted murders in the above listed manners is not unconstitutional, neither this court nor the trial court is in a position to countermand the finding of the Supreme Court of Ohio that the death penalty is not unconstitutional. See, State v. Madrigal,87 Ohio St.3d at 398-399.
Accordingly, all of appellants arguments in support of his first assignment of error are not well-taken. Appellant's first assignment of error is not well-taken and is denied.
In support of his second assignment of error, appellant argues that the postconviction procedures in Ohio do not provide an adequate remedy. Specifically, he argues that the trial court abused its discretion when it denied his request to conduct discovery before the trial court ruled on his petition for postconviction relief.
Appellant argues that petitioners cannot possibly meet the requirement to file a petition with evidence dehors the record without the benefit of discovery that is available to every other civil litigant. He says that without a subpoena power, or the right to file interrogatories or to take depositions, petitioners are left without any way to compel witnesses to provide necessary information. He also argues that he should be permitted to have experts appointed to help him at court expense, and that he should have the right to have the prosecutors' files reviewed in camera
to ensure that no relevant evidence was withheld.
The Supreme Court of Ohio has said: "there is no requirement of civil discovery in postconviction proceedings." State ex rel. Love v. CuyahogaCounty Prosecutor's Office (1999), 87 Ohio St.3d 158, 158. Furthermore, district courts of appeal in Ohio have ruled that discovery as provided in the civil rules is not required in postconviction relief proceedings. See, e.g., State v. Smith (1986), 30 Ohio App.3d 138; State v. Phillips
(Feb. 3, 1999), Summit App. No. 18949, unreported; see, also State v.Clemons (Apr. 30, 1999), Hamilton App. No. C-980456, unreported (procedure in R.C. 2953.21 takes precedence over civil rules). Based upon this precedent, we find that the trial court did not abuse its discretion when it denied appellant's request for discovery in this case. Appellant's second assignment of error is not well-taken.
In support of his third and final assignment of error, appellant argues that the trial court erred when it dismissed his claim of ineffective assistance of counsel based upon his trial attorneys' failure to call an expert witness on eyewitness identification. The trial court held an evidentiary hearing on this claim before it issued a judgment dismissing the claim.
Appellant says that the testimony he presented at the hearing showed that his trial counsel fell below an objective standard of reasonable representation when they failed to call an expert on eyewitness identification. He argues that an attorney who testified on his behalf at the hearing established that trial counsel owe a higher standard of representation to clients who are facing a possible death penalty. The attorney testified that the eyewitness identifications were crucial in this case, and that he would not have tried the case without asking for funds to hire an eyewitness identification expert.
Appellant also says that the evidence he presented showed that his case was prejudiced by the failure to call an expert on eyewitness identification. He again points to the testimony of the attorney who testified at the evidentiary hearing. The attorney stressed that the eyewitness identifications of appellant were the primary evidence in the case linking appellant to the crimes. Appellant says the testimony of the attorney, and of an expert on eyewitness identification who testified at the hearing, showed that he would have been able to specifically explain why the eyewitness identifications made in his case were unreliable. He says that while his attorneys did conduct cross-examinations in which they tried to challenge the reliability of the eyewitness identifications, the effectiveness of the cross-examinations was undermined because his trial counsel did not have extensive knowledge of information known to scientists regarding the problems associated with cross-racial identifications, the effects of stress on identifications, or unconscious transfer of information from media reports or composite drawings. He concludes:
 "Had the flaws in eyewitness identifications been properly framed for the jury, it would have been left with nothing but doubt as to Appellant's participation in this crime."
The trial court acknowledged that the defense attorney who testified said in his opinion an eyewitness expert should have been called in appellant's defense. However, the trial court also Cnoted that the defense attorney acknowledged on cross-examination that there is no law in Ohio that would establish a requirement that an expert on eyewitness identification be called. Instead, there is case law establishing that it is appropriate for trial counsel to challenge eyewitness identifications through cross-examinations and closing arguments. SeeState v. Pattin (Aug. 7, 1992), Lucas App. No. L-91-339, unreported.[1]
The trial court therefore ruled that appellant had not shown that his trial counsel fell below an objective standard of reasonable representation when they did not seek funds to hire an expert on eyewitness identification. After carefully reviewing the record and the law, we agree with the reasoning of the trial court.
We further agree that even if it were assumed arguendo that appellant met the first part of the test for ineffective assistance of counsel, he failed to show that he meets the second part of the test. Our careful review of the record shows that appellant's trial counsel effectively used cross-examination to show that there were inconsistencies in the descriptions provided by eyewitnesses at the time of the crime and in appellant's appearance. Through cross-examination trial counsel showed that no witness had described appellant as having a beard and mustache, even though appellant did have both on the date the crime occurred and when he was later arrested. They showed that one eyewitness chose another individual in a police line-up before appellant was arrested. They showed that many of the eyewitnesses were under severe stress at the time they were forming their impressions of what the criminal looked like, that they had limited time to make any observation of the criminal, that their vantage points did not permit them to see the entire face of the criminal, and that many of the witnesses spent more time looking at the gun the criminal was holding. Furthermore, appellant's trial counsel argued all of these points in closing arguments. We therefore concur with the trial court that the evidence presented at the hearing did not show that appellant was prejudiced by the representation he received from his trial counsel. Appellant's third assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 ___________________________ Peter M. Handwork, J.
Melvin L. Resnick, J., Mark L. Pietrykowski, J., CONCUR.
[1] Appellant argues that his case is distinguishable from State v.Pattin (Aug. 7, 1992), Lucas App. No. L-91-339, unreported, because in that case the trial counsel did ask for funds to hire an expert on eyewitness identification. While it is true that trial counsel in Statev. Pattin did ask the trial court for funds to hire the expert and then argued on appeal that the trial court abused its discretion when it denied the requests, id., the distinction does not affect the statements of this court that there are several alternative devices that fulfill the same function as appointing an expert on eyewitness identification, such as cross-examining the eyewitnesses, pointing out inconsistencies in identifications and raising the points in closing argument.